UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| AMERICANS FOR PUBLIC TRUST, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CENTERS FOR DISEASE CONTROL | ) | |
| AND PREVENTION and | ) | Civil Action No. 1:21-CV-2834-ELR |
| | ) | |
| U.S. DEPARTMENT OF HEALTH | ) | |
| AND HUMAN SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF ROGER ANDOH

Pursuant to 28 U.S.C. § 1746 and under penalty of perjury, I, Roger Andoh, declare that the following enumerated statements are true and correct to the best of my knowledge.

1.  I am over 18 years old and competent to testify.

2.  I am submitting this declaration in my capacity as Director of the Freedom of Information Act Office for the Centers for Disease Control and Prevention/Agency for Toxic Substances and Disease Registry ("CDC/ATSDR"), an entity of the U.S. Department of Health and Human Services (HHS). In this capacity, I am the Freedom of Information Officer for CDC/ATSDR.

1

3.     I have been in my current position since June 2016, and I have personal knowledge of the matters and facts discussed in this declaration and any attachments to this declaration. I further make this declaration based upon information available to me in my official capacity.

4.     As the FOIA Officer, I supervise and direct the day to day activities of the CDC/ATSDR FOIA Office (hereinafter referred to as "CDC-FOIA"). CDC-FOIA is the central office responsible for responding to requests for information under the FOIA for records from all operating divisions of the CDC and the ATSDR. FOIA requests are disseminated electronically to areas within the agency that are considered most likely to possess responsive records. In my position, I determine whether to release or withhold records, or portions of records, in accordance with the FOIA and the HHS implementing regulations. I also coordinate efforts, as necessary, when one or more of the CDC Centers/Institutes/Offices or one of the ATSDR Divisions is involved in responding to a FOIA request.

5.     Due to the nature of my official duties, I am familiar with the procedures followed by CDC-FOIA in responding to requests for information pursuant to the provisions of FOIA, and specifically, I am familiar with CDC-FOIA's handling of the FOIA request at issue in the above-captioned matter, which is described below. I have reviewed the documents at issue in the above-captioned litigation, as well as the *Vaughn* index describing withheld information that is at

issue in this action. The Defendants' *Vaughn* index is attached to this Declaration in four parts as Exhibit 1.

6.     I make this declaration based upon both my personal knowledge and information that I have received in the course of my official duties as the Freedom of Information Officer for the CDC, as well on the basis of information I have received in conducting these consultations and collecting all of this information.

### *FOIA Request Number #21-00613-FOIA*

7.     On February 4, 2021, CDC-FOIA received a FOIA request from Plaintiff erroneously dated February 4, 2020  via electronic mail ("Plaintiff's FOIA Request"). A copy of Plaintiff's FOIA Request is attached to this Declaration as **Exhibit 2.**

8.     Plaintiff's FOIA Request sought the following documents:

Emails, communications, correspondence, and/or talking points describing CDC guidance for the reopening of schools, during the above stated time period, in the following CDC staff email accounts: Rochelle Walensky (Director), Anne Schuchat (Principal Deputy Director), Christopher Jones (Associate Director for Communication), Robin Ikeda (Associate Director for Policy and Strategy), Mitchell Wolfe (Chief Medical Officer), Sherri Berger (Chief of Staff), [and] Jeff Reczek (Director, Washington Office.

I seek any and all records, as that term is defined under FOIA (5 U.S.C. § 552(f)(2)), and applicable case law (*see, e.g.*, *Forsham v. Harris*, 455 U.S. 169, 193 (1980)), existing in any format whatsoever, including, but not limited to, written correspondence, email correspondence, records of telephone correspondence, records pertaining to in-person meetings,

calendar or scheduling entries, videotapes, photographs, computer printouts, telephone messages, or voice mail messages between January 15, 2021 to the present.

9.     CDC-FOIA's formal acknowledgment letter of Plaintiff's FOIA Request was sent to Plaintiff on February 5, 2021, and is attached to this Declaration as **Exhibit 3**. In that letter, CDC-FOIA assigned Plaintiff's FOIA Request the reference *#21-00613-FOIA*, confirmed the CDC's receipt of the request, and indicated that Plaintiff's FOIA Request had been placed in the complex processing queue. *Id*. CDC-FOIA further explained in that letter that it reasonably expected "to consult with two or more C/I/O/s [(meaning, Centers, Institutes, and Offices)], or another HHS operating division or another federal agency about" Plaintiff's FOIA Request.

### *First Search and Production of Records*

10.    Following the correspondence mentioned above in Paragraph 9, on February 8, 2021, the FOIA Analyst for CDC-FOIA sent a request for documents (RFD) to CDC-FOIA's Information Technology (IT) team to run a search on the Outlook mailboxes of the individuals listed in Plaintiff's FOIA Request.

11.    The RFD was sent to IT for three reasons. First, as stated in Paragraph 8 above, Plaintiff's FOIA Request was seeking "emails, correspondence, and/or talking points" for the reopening of schools in the email accounts of the following staff: Rochelle Walensky (Director), Anne Schuchat (Principal Deputy Director),

Christopher Jones (Associate Director for Communication), Robin Ikeda (Associate Director for Policy and Strategy), Mitchell Wolfe (Chief Medical Officer), Sherri Berger (Chief of Staff), Jeff Reczek (Director, Washington Office). Given that IT is a centralized CDC entity, it is in the unique strategic position to access the email mailboxes of all CDC staff, including therefore, the email mailboxes of the seven CDC individuals mentioned in Plaintiff's FOIA Request. Consequently, it was more efficient to send the RFD to IT rather than asking each of these individuals to search their own email mailboxes.

12.     The second reason why the RFD was sent to IT was that the types of records that Plaintiff sought, which were email, correspondence, talking points, or both, were the types of records that are generally maintained in Outlook mailboxes, which again are all accessible by IT. At the time of the Request, most CDC staff were on full telework, so responsive records would have been entirely electronic and communications made via email.

13.     Finally, the third reason why the RFD was sent to IT was that through Microsoft Enterprise (a comprehensive platform that allows access to all Microsoft products), IT has the technological capability to search the mailboxes of multiple custodians at the same time, and with multiple keywords. In fact, CDC-FOIA has an agreement with the different offices that administer the various HHS programs stating that, when a FOIA request is straight forward and appropriate for a Microsoft

Enterprise or IT search, IT will be the entity to run the search. This agreement avoids duplication of efforts and saves CDC's resources. As a result of the above, CDC-FOIA opined that the streamline approach to handle Plaintiff's FOIA Request was to send the RFD to IT.

14.    Upon receipt of the RFD, on February 22, 2021, IT conducted its initial search. The keywords and Boolean parameters used in  this search were: a) "reopening of school*" OR b) "reopening" AND "school*" OR c) "guidance" AND "reopening" AND "school*" OR "childcare." These keywords were selected because they not only mirrored the wording in Plaintiff's FOIA Request which as stated in Paragraph 8 above, sought records "describing CDC guidance for the reopening of schools," but they also appropriately captured Plaintiff's intent. The asterisk shown behind certain words denoted a search  for any conjugate of that search term – for example, the search term "school*" included searches for records which contained the words "school," "schools," "schooling," "schooled" and any other conjugate of the word "school."

15.    The type of documents that IT searched included emails, communications, correspondence, and/or talking points. IT targeted this category of records because as stated in Paragraph 8 above, Plaintiff's FOIA Request had requested "emails, communications, correspondence, and/or talking points."

16.     Regarding the time frame, even though as stated above in Paragraph 8, Plaintiff's Request had sought records from January 15, 2021 to the present, which the CDC could have reasonably interpreted to mean to the date of Plaintiff's letter (February 4, 2021), the CDC used a wider time range that reflected the date of the first search, February 22, 2021. (I misstated, in an earlier declaration, that the search occurred on February 24, 2021.) This wider time range resulted in the identification of a larger group of potentially responsive records.

17.     Using the Microsoft Office 365 eDiscovery tool and criteria listed above in Paragraphs 14 through 16, on February 22, 2021, IT conducted the search in the Outlook sent mailboxes of six of the seven individuals listed in Plaintiff's FOIA Request but inadvertently left Ms. Schuchat out. (The recognition and correction of these two search errors are described below.)

18.     Once CDC-FOIA received from IT the records that resulted from the search, a CDC-FOIA analyst uploaded them in the FOIAXpress system so that the analyst could process the results for any applicable FOIA exemptions. FOIAXpress is an all-inclusive system that provides a FOIA Office with all tracking, storage, processing, communication, management, and reporting tools required to administer its FOIA program.

19.     As a result of this processing, CDC-FOIA identified 497 pages of responsive documents. (The processing of records and reasoning for exemptions is

more fully described below.) Consequently, on April 21, 2021, the CDC sent a letter to Plaintiff indicating that it had identified 497 pages of responsive records, was releasing 63 pages in full, 189 pages in part, and withholding 148 pages in full pursuant to FOIA Exemptions 5 and 6, 5 U.S.C. § 552(b)(5) and (b)(6). A copy of this correspondence is attached to this Declaration as **Exhibit 4**. The letter also informed Plaintiff that 97 pages of the 497 pages were being referred to another FOIA Office of HHS, at the Office of the Secretary for their direct response to Plaintiff. Id.

### *Application of Exemption 5 of the FOIA*

20.     For purposes of background, President Biden had issued an Executive Order on Jan. 21, 2021, supporting the reopening and continuing operation of schools. The Biden-Harris administration had identified the safe reopening of schools as a top national priority. To support this priority, HHS and CDC had issued guidance to help the U.S. mitigate and minimize infections, community spread, hospitalizations, and deaths from COVID-19. The CDC had worked in consultation with other agencies and constituencies to formulate guidance for getting more children safely back into schools—"Guidance for COVID-19 Prevention in K-12 Schools," released February 12, 2021 ("Guidance").

21.     Prior to the publication of the Guidance, the CDC had also gathered input to help inform agency policy from various sources by participating in roundtables, listening events, conference calls, media events, interviews, and other

meetings. The input gathering process also included the use of consultants to aid the agency in drafting, editing, and deliberating the language and content of the Guidance. (*See*, *e.g.*, *Vaughn* II, ¶¶7, 8, 9.) To the extent other targeted persons or organizations were consulted for their unique perspectives to help the CDC complete its draft of the Guidance, they were limited, non-public disclosures of the draft solely to assist the agency in finalizing its policymaking. (*See*, *e.g.*, *Vaughn* II, ¶¶39, 40, 53, 63 (internal agency deliberations regarding solicited feedback).) Although one version of the draft Guidance was confidentially released for the purpose of informing the agency's continued deliberations, subsequent iterations prior to the final version were not, and the CDC is unaware of any consultant or agency partner disclosing either the draft Guidance or the content and nature of the ongoing deliberations.

22.     Preparation for the various pre-release listening events and post-release messaging events included extensive internal deliberations about (i) the information to reveal at any point prior to the issuance of the final policies, (ii) how to convey information to various constituencies in a way that is clear and promotes public health and safety, and, among other things, (iii) the right language to include in any final policies. The agency had engaged in discussions with other agencies, Congress, the White House, governors, parents, and teachers (who possessed not only a specific body of knowledge and a unique perspective but would be necessary for

schools to reopen), and they had drafted talking points and memoranda for CDC officials' use in those discussions. The content and language of the Guidance and subsequent updates as well as the talking points and memoranda (including summaries of the Guidance and "fact sheets") developed for discussions had been the subject of extensive drafts and deliberations to help shape the final language.

23.     Both before and since February 12, 2021, the CDC officials had been engaged in ongoing inter- and intra-agency discussions to consider and develop the agency's initial and continuing positions on how schools could reopen and stay open safely. Due to the ongoing nature of the pandemic, the CDC has continued to refine and adapt its Guidance on school reopening, and it had added several updates to the initial February 12 Guidance. Those updates, once published, were part of the agency's final policies. The CDC's website in fact lists the many substantive policy updates it has made to the Guidance since the initial publication.

24.     The material that CDC-FOIA exempted under FOIA Exemption 5 included:

   a.  Drafts of the Guidance, including tracked changes and comments by agency officials. Almost 150 pages of the initial responsive records withheld completely were drafts.

   b.  Emails containing portions, paragraphs, or summaries of the draft Guidance with comments or edits by agency officials.

c. Emails reflecting the agency's internal deliberations and rollout plans as well as the discussions with other agencies and Congress as the agency developed the Guidance and determined how to communicate it most effectively across the government.

d. Emails reflecting the agency's draft agenda, proposals, and considered talking points for discussions with governors and other interested stakeholders like parents and teachers as the agency developed the Guidance and determined how to communicate it most effectively to the public at large and including emails regarding White House briefings.

25. FOIA Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." In those cases when information has been withheld or redacted in the records provided to the Plaintiff, the deliberative process privilege stated in Exemption 5 of the FOIA applied to those materials. The deliberative process privilege protects "advice, recommendations, and opinions that are part of the deliberative, consultative and decision making process of the government."

26. Here, FOIA Exemption 5 was applied to protect pre-decisional, deliberative communications among staff regarding the entire decision-making

process of creating and communicating a comprehensive school guidance during COVID-19. Specifically, of the records produced, the CDC also exempted records or portions of records that included inter-agency and intra-agency deliberations, discussions, opinions, thoughts, comments, edits, and other statements that informed, facilitated, refined, or assisted in the development of agency policy, as well as records or portions of records containing protected information exchanged with close advisers to the President from the Executive Office of the President on related matters, such as communicating the agency's guidance to interested stakeholders and the public at large. Such exempt record portions were redacted and marked "(b)(5)."

27.     These deliberative communications, as well as the draft versions of the Guidance contained recommendations, issues, opinions, and advice; all of which were taken under advisement for the crafting and communicating of the final version of the CDC's Guidance. The release of non-final agency policies or records could cause public confusion as to what constitutes the final, implemented agency policy, causing harm by providing the public with erroneous information on a particularly sensitive matter.

28.     In tandem with the drafting of the Guidance, there were also several press briefings provided by the CDC Director. Draft versions of the press briefings were withheld under the deliberative process privilege because, up to the actual

briefings or interviews, CDC officials were deliberating, debating, and amending what would or would not be stated.

29.    Exemption 5 was also applied to interagency communications between the Department of Education, the Office of Management and Budget, HHS, and CDC on the decision making process of this Guidance, which were also held under the deliberative process privilege.

### Presidential Communications Privilege

30.    Additionally, several records contained Executive Office Privilege (EOP) equities were withheld as deliberative but were also exempt from production pursuant to the presidential communications privilege. This privilege under Exemption 5 protects documents solicited and received by the President and/or his immediate White House advisers who have broad and significant responsibility for investigating and formulating the advice to be given to the President. Information withheld included briefing materials and other background information that reflected internal deliberations regarding matters of policy.

31.    The presidential communications privilege applies to documents reflecting the conversations that take place in the President's performance of his official duties, as well as information that is solicited and received by the President or an immediate White House adviser to the President or their staff who has broad

and significant responsibility for investigating and formulating the advice to be given to the President.

32.    I have personally reviewed the responsive records at issue in this case and am familiar with the contents of the records. CDC FOIA staff, including myself, have consulted with Dr. Henry Walke, Director of the Center for Preparedness and Response and the former incident manager for the CDC's COVID-19 response and chief CDC spokesperson, and the White House Counsel's Office to review the facts necessary to determine that the documents contained presidential communications and agency deliberations.

33.    HHS withheld in part four records (*Vaughn* I, ¶¶72; *Vaughn* II, ¶¶10-12) and withheld in full thirty-four records (including emails and attachments as separate records) under FOIA Exemption 5, 5 U.S.C. § 552(b)(5), pursuant to the presidential communications privilege. *See Vaughn* I, ¶72, *Vaughn* II, ¶¶1, 2, 11-12, 18-20, 34-35, 43-44, 47, 49, 54-55, 58-61, 71-72, 82-83; *Vaughn* III, ¶3-4, 13, 19-20, 38-39, 74, 76-77, 81. Each of these thirty-eight records is protected by the presidential communications privilege because it is either (a) a communication with Jeff Zients, the White House Coronavirus Response Coordinator and Counselor to the President, or Carole Johnson, the White House coronavirus disease (COVID) Response Team Testing Coordinator, soliciting, receiving, or communicating information in the course of their duties as an immediate adviser to the President, or

a staff member of an immediate adviser to the President, on matters of the federal government's response to the COVID-19 pandemic; (b) a communication from the White House Associate Director of Presidential Scheduling to attendees of a presidential briefing discussing the briefing; or (c) a communication responding to a request made by Mr. Zients or Ms. Johnson soliciting and receiving information in preparation for a presidential briefing.

34.     Mr. Zients is an immediate adviser to the President with broad responsibilities over the government's response to the COVID-19 pandemic response. In his role as Coordinator of the COVID-19 Response and Counselor to the President, Mr. Zients oversees the response to COVID-19 across the federal government, including formulating and implementing policies for testing, vaccine distribution, mobilization of economic aid, and other priorities. Mr. Zients frequently meets with and advises the President on numerous aspects of the national response to COVID-19. Mr. Zients is at the rank of Assistant to the President.

35.     Ms. Johnson is also an immediate adviser to the President with broad responsibilities related to COVID-19. Ms. Johnson focuses on COVID-19 testings and also devotes time to other public health matters, such as responding to surges in COVID-19 cases. She formulates advice to the President related to the national response to the COVID-19 pandemic and serves on the team led by Mr. Zients. She is at the rank of Deputy Assistant to the President.

36.     As reflected in the *Vaughn* index, eight of the thirty-eight responsive records that are protected by the presidential communications privilege are email chains and their attachments between Mr. Zients, Natalie Quillian, the Deputy COVID-19 Response Coordinator, Farhana Hussain, an Advisor to Mr. Zients, Dr. Rochelle Walensky, the Centers for Disease Control and Prevention (CDC) Director, and Ms. Sherri Berger, the CDC Chief of Staff. *Vaughn* I, ¶¶3, 19; *Vaughn* II, ¶¶1, 18, 34, 58, 60, 71. These e-mails discuss preparations for briefing the President on the response to COVID-19, specifically, opening schools, and attach draft briefing and preparatory materials. The disclosure of these documents would reveal information about the formulation of advice to the President regarding the federal government's response to COVID-19.

37.     As reflected in the *Vaughn* index, twelve of the thirty-eight responsive records withheld under the presidential communications privilege are email chains and their attachments between Ms. Johnson, Dr. Walensky, Dr. Anne Schuchat, who at the time was the Principal Deputy Director of CDC, Dr. Henry Walke, Dr. Christopher Jones, Associate Director for Communication, and Dawn O'Connell, the Assistant Secretary for Preparedness and Response. *See Vaughn* II, ¶¶1, 2, 18, 19, 34, 35, 71, 72; *Vaughn* III, ¶¶3, 4, 19, 20. These emails discuss preparations for briefing the President on the response to COVID-19, specifically, opening schools, and attach draft briefing and preparatory materials. On its face, the document at

*Vaughn* II, ¶34 explains that the conversations and attachments are in preparation for Dr. Walensky's meeting with the President. The disclosure of these documents would reveal information about the formulation of advice to the President regarding the federal government's response to COVID-19.

38.     Seventeen of the responsive records that are withheld in full under the presidential communications privilege reflected in the *Vaughn* index are email chains between Dr. Walensky, Dr. Anne Schuchat, Dr. Henry Walke, and Ms. Sherri Berger, and attachments. The emails include discussions on preparations for briefing the President on the response to COVID-19, specifically, opening schools, and, in some instances, attach draft briefing and preparatory materials created or sent at Ms. Johnson's or Mr. Zients's requests.

39.     My knowledge of the contents of the records and the basis for the invocation of Exemption 5 is further informed by consultations I have had with Dr. Walke regarding the email chains and attachments between Dr. Walke, Dr. Walensky, Dr. Shuchat, and Ms. Berger. Dr. Walke confirmed that the emails reflect discussions regarding preparation for Dr. Walensky's meeting with the President and that the attachments were prepared for the same briefing. Further, on their face, documents found at *Vaughn* II, ¶¶44 and 47 explain that Ms. Johnson solicited information in preparation for the presidential briefing. Disclosure of these records would reveal information about the formulation of advice to the President regarding

the federal government's response to the COVID-19 pandemic, including opening schools.

40.    The final document of the responsive records that are withheld in full under the presidential communications privilege reflected in the *Vaughn* index is an email chain between Ms. Alyssa Giammarella, the White House Associate Director of Presidential Scheduling and others including Ms. Berge, Dr. Walensky and Mr. Zients, discussing preparations for briefing the President. *Vaughn* III, ¶74. On its face, this document shows topics and invitees for Dr. Walensky's meeting with the President and describes logistical preparations for that briefing. The disclosure of this document would reveal information about the formulation of advice to the President regarding the federal government's response to COVID-19.

41.    In accordance with 5 U.S.C. § 552(a)(6)(B)(iii)(III) and 45 C.F.R. § 5.25(b)(1), CDC FOIA staff consults with other agencies when records contain within them information of interest to another agency or Federal Government office. My staff consulted with the White House Counsel's Office prior to applying the presidential communications privilege to the thirty-eight documents identified in the *Vaughn* index.

### *Risk of Foreseeable Harm*

42.    The CDC determined that there was foreseeable harm if the redacted records were released. The CDC opined that its decision making process would be

hindered if its draft documents and deliberative discussions were made publicly available. If agency officials thought their opinions, thoughts, and deliberations would be public and front page news, those officials would not speak openly or as candidly. In the midst of the COVID-19 pandemic, chilling those discussions not only harms the agency but impacts the public. Long-term, such a chilling effect would result in weakened policies that undergo less scrutiny, vetting, questioning, and testing because of concerns regarding subsequent disclosure.

43.    Furthermore, the public disclosure of drafts and pre-decisional questions could cause confusion on what guidance was final. At risk are the health and lives of thousands of Americans who might be confused by or ignore or distrust final guidance if it is contradicted or questioned based on pre-decisional deliberations made public. There was already a crisis of misinformation with respect to the pandemic and mitigation strategies—in addition to the more global misinformation crisis. As was evident from the spikes in COVID-19 infections and hospitalizations, the confusion and uncertainty regarding public health policies was dangerous and deadly. As a result, it was, and is, of critical importance that agency officials continue to speak freely amongst themselves as they formulate these policies and that those deliberations be excluded from disclosure.

44.    Likewise, if email exchanges like these between Executive Branch officials and immediate White House advisers and their staffs on matters related to

the advisers' responsibilities were to be publicly disclosed, information flow would be stifled, resulting in a chilling effect on the sharing of frank and candid ideas and opinions that enable a presidential adviser to formulate the best possible advice, thereby impairing the President's ability to fully and faithfully carry out his duties. In sum, public disclosure of the documents identified as subject to the Presidential Communications Privilege would greatly risk harming the quality of information and advice available to the President, to the detriment of presidential decision-making.

### *Exemption 6, Segregability, Discretionary Disclosure*

45. Exemption 6 of the FOIA permits a federal agency to withhold information about individuals that "would constitute a clearly unwarranted invasion of personal privacy."

46. Exemption 6 was applied to protect information that "would constitute a clearly unwarranted invasion of personal privacy," including personal identifiable information of private citizens who were a part of the teachers' roundtable discussion with the CDC Director. *See*, *e.g.*, *Vaughn* I, ¶¶5, 7, 14, 18, 19, 24, 25. Exemption 6 was also used to protect phone numbers and passcodes to internal agency conference lines. *See*, *e.g.*, *Vaughn* I, ¶28, 36; *Vaughn* II, ¶26; *Vaughn* III, ¶28, 54, 60-65. Exemption 6 was further applied to emails and phone numbers of some CDC officials and EOP staff. *See*, *e.g.*, *Vaughn* I, ¶¶4, 6, 9; *Vaughn* II, ¶¶24, 26, 70;

*Vaughn* III, ¶¶41, 42, 60-61. Release of high ranking EOP email addresses and phone numbers could reasonably be expected to constitute an unwarranted invasion of personal privacy by subjecting personnel to harassment and annoyance in conducting their official duties.

47.    CDC completed a line-by-line review of all material and determinations were made based off the content in the records. All reasonably segregable nonexempt information was released to Plaintiff, and only portions protected by privacy interests and the deliberative process privilege were withheld from Plaintiff. The draft records that were fully withheld represent the agency's tentative selection and deliberation on what studies and other material to include or exclude in the Guidance. The agency's assessment of such material is deliberative. The very act of selecting what information—both factual and opinion—to include in a draft document or in a communication discussing the proposed Guidance is itself a deliberative process that would be chilled to the agency's and the public's detriment if not protected. Moreover, any arguably non-exempt material was too intertwined with exempt material that any attempt to segregate would either reveal the agency's deliberative process or production of a redacted version would be incomprehensible.

48.    In addition to the foregoing, information that was withheld was not appropriate for discretionary disclosure. In determining whether to make a discretionary release, the age of the document and the sensitivity of its content need

to be evaluated. While it is true that agencies may use their discretion to release information with the passage of time, the records involved here are still too recent to be released. The Guidance was released in February of this year (2021). Additionally, the agency is still actively working on and releasing updated guidance based on evolving evidence of COVID-19 transmission in K-12 schools and the advent of vaccines for children 5-16. Due to the ongoing decision making processes, the content of these records is too sensitive to be provided to Plaintiff under discretionary release.

49.     Finally, some of the records produced by the search included material that was nonresponsive to Plaintiff's FOIA Request. The CDC produced this nonresponsive material unless exempt. For example, if an email included recommendations to edit a paragraph of the Guidance but also included recommendations to edit *workplace* guidance, or to circle back on a tangential policy issue, such deliberative, pre-decisional communications were redacted as exempt and marked "(b)(5)."

### *Referrals to Other Entities*

50.     As stated above in Paragraph 19, CDC-FOIA's April 21, 2021 letter to Plaintiff informed Plaintiff that 97 pages of these 497 pages were being referred to another FOIA Office of HHS for their direct response to Plaintiff. *See* Ex. 4. CDC-

FOIA also provided the contact information of the FOIA Office to whom they had referred these 97 pages. *Id.*

51.    HHS has several FOIA Offices who operate as Service Centers. Some of these offices relate to the Administration for Community Living (ACL), Administration for Children and Families (ACF), Agency for Healthcare Research and Quality (AHRQ), Centers for Disease Control and Prevention (CDC), or Centers for Medicare and Medicaid Services (CMS), among others. Each of the HHS FOIA Service Centers has specific functions and responsibilities. When a requester sends a request to one of the FOIA Service Centers, the requester can request all records that relate to that particular Service Center or that are in that entity's possession and not already in the public domain (e.g., in the library or available from a clearinghouse) which are subject to FOIA. In this case, Plaintiff sent its request only to the Service Center for the CDC, that is, CDC-FOIA.

52.    While processing the responsive documents, CDC-FOIA discovered that some of the responsive records fell under the jurisdiction of the Freedom of Information/Privacy Acts Division, Office of the Assistant Secretary for Public Affairs ("ASPA"), Office of the Secretary ("OS") which is an Office of the Secretary Staff Division ("OS-FOIA"). This meant that even though some records were in the custody of the CDC and included CDC's interests or equities, they had originated with a different entity than the CDC, and hence, contained equities over which the

CDC could not opine. As a result, these records needed to be referred to OS-FOIA

so that it could oversee the review and potential release of these records.

53.     Given that CDC's equities also applied to these records, prior to

referral, the CDC first applied its own exemptions. On April 21, 2021, on the same

day that CDC-FOIA sent Plaintiff the letter mentioned above in Paragraph 19, CDC-

FOIA referred these records to OS-FOIA so that OS-FOIA could apply their own

appropriate FOIA exemptions and protect their equities. A copy of this

correspondence is attached to this Declaration as **Exhibit 5**.

54.     In its referral to OS-FOIA, CDC-FOIA attached the 97 pages and a

copy of its April 21, 2021 letter to Plaintiff. *Id*.

55.     CDC-FOIA also sent records originating or containing White House

equities from the EOP (defined above in Paragraphs 30-31) to that Office for

consultation so that they could review their own equities. Because some of the

responsive records contained White House equities, those records were sent to the

Office of the Counsel to the President for consultation, consistent with the

longstanding practice described above.

56.     On May 14, 2021, Plaintiff submitted an appeal regarding the use of

FOIA Exemption 5 in the 400 pages of records produced. A copy of this

correspondence is attached to this Declaration as **Exhibit 6.** In its appeal, Plaintiff

stated that "many of the fully withheld records (as well as numerous substantially

redacted portions of those that were produced) were improperly withheld under the deliberative process privilege exemption and [were] subject to disclosure under FOIA." Id. Plaintiff further stated that "it is highly unlikely that each piece of information 'formed an essential link' in the consultative process leading to the CDC's formulation of its policy." Id.

57.    OS-FOIA notified Plaintiff, on May 17, 2021, that it would not be able to make a determination within 20 days. A copy of this correspondence is attached to this Declaration as **Exhibit 7.**

58.    Prior to any determination regarding the propriety of the use of the "(b)(5)" exemption, Plaintiff filed this lawsuit. After HHS learned of the lawsuit, OS-FOIA administratively closed the appeal on July 30, 2021.

59.    After Plaintiff filed this lawsuit, the CDC, in coordination with HHS and other interested agencies and entities, reviewed the original records and identified one 14-page attachment that was not included in the initial production of records, and the CDC then sent an additional release to Plaintiff on September 1, 2021. That release comprised the entire first set of records (400 pages) that had already been sent to Plaintiff on April 21, 2021, as well as the now additional 14 pages, hence a total of 414 pages. That production was not the result of a new search. A copy of this correspondence is attached to this Declaration as **Exhibit 8**.

### *Second Search and Production of Records*

60.    On or about August 30, 2021, I learned that an email containing a draft of the Guidance might have been shared with the American Federation of Teachers ("AFT"). No such email was captured in the initial search or responsive to Plaintiff's Request, but it was determined that the Guidance was, at times, referred to as the "operational strategy." Consequently, CDC-FOIA instructed IT to conduct a second search, which was implemented on or about September 1, 2021. This second search focused on the same date range as the first search and in the same "sent" folders but for all seven individuals listed in Plaintiff's FOIA Request. The keywords and Boolean parameters used for this search, however, were "CDC operational strateg*" OR "k-12 operational strateg*".

61.    As a result of this second search, the CDC identified 1,291 pages of responsive records. On October 8, 2021, CDC-FOIA released 162 pages in part, withheld 778 pages in full pursuant to FOIA Exemptions 5 and 6, and released 137 pages in full—responsive records included 214 pages of White House EOP records. A copy of this correspondence is attached hereto as **Exhibit 9**. The White House too had reviewed their records and determined the appropriate exemptions to invoke on their documents.

62.    As stated in Paragraph 25 above, FOIA Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by

law to a party other than an agency in litigation with the agency." For this release, CDC-FOIA applied FOIA Exemption 5 for the same reasons stated in Paragraphs 26 through 29 above.

63.    As already stated in Paragraphs 45 and 46 above, FOIA Exemption 6 permits a federal agency to withhold information about individuals that "would constitute a clearly unwarranted invasion of personal privacy." Exemption 6 was applied in this production to protect phone numbers and passcodes to internal conference lines, as well as cell numbers. This exemption was applied to emails and phone numbers of EOP staff. Release of high ranking EOP email addresses and phone numbers could reasonably be expected to constitute an unwarranted invasion of personal privacy by subjecting personnel to harassment and annoyance in conducting their official duties.

64.    As was the case in Paragraph 47 above, the CDC reviewed these records for reasonably segregable, non- exempt information and disclosed all reasonably segregable, non-deliberative material. The draft records that were fully withheld represent the agency's tentative selection and deliberation on what studies and other material to include or exclude in the Guidance. The agency's assessment of such material is deliberative.

### Third Search and Production of Records

65.    On October 13, 2021, as it prepared to explain its search process in support of a motion for summary judgment, CDC-FOIA became aware that IT had only searched the "sent" mailboxes in each of the two previous searches. Confusing Plaintiff's Request with a similar FOIA request processed at or around the same time that only requested sent items, the analyst searched only outgoing emails as he had done for the other request. On October 14, 2021, CDC-FOIA instructed IT to conduct a third and completely new search of all mailboxes (inbox, sent, drafts, deleted) for a comprehensive set of records. IT then searched the mailboxes of Rochelle Walensky (Director), Anne Schuchat (Principal Deputy Director), Christopher Jones (Associate Director for Communication), Robin Ikeda (Associate Director for Policy and Strategy), Mitchell Wolfe (Chief Medical Officer), Sherri Berger (Chief of Staff), Jeff Reczek (Director, Washington Office).

66.    The keywords and Boolean parameters used in this search were a) "CDC operational strateg*" OR b) "k-12 operational strateg*" OR c) "reopen*" AND "school*" OR d) "guidance" OR "guideline*" OR "procedure*" OR "strateg*" AND "reopen*" AND "school*".

67.    Because this search encompassed records already processed and provided to Plaintiff during prior releases, those records were not re-processed and were instead marked as duplicates.

68.     The search identified 1,667 pages of responsive records. On November 19, 2021, the CDC released 1,667 pages to Plaintiff which were comprised of 114 pages disclosed in part, 114 released in full, 1,273 pages withheld in full— responsive records included 166 pages of White House EOP records. A copy of this correspondence is attached hereto as **Exhibit 10**.

69.     CDC-FOIA applied FOIA Exemption 5 for the same reasons stated in Paragraphs 26 through 29 above. The White House too had reviewed their records and determined the appropriate exemptions to invoke on their documents.

70.     FOIA Exemption 6 permits a federal agency to withhold information about individuals that "would constitute a clearly unwarranted invasion of personal privacy." FOIA Exemption 6 was applied here for the same reasons stated in Paragraphs 45 and 46 above.

71.     As it had done in the previous releases, CDC-FOIA also reviewed these records for reasonably segregable, non-exempt information and disclosed all reasonably segregable, non-deliberative material. The draft records that were fully withheld represent the agency's tentative selection and deliberation on what studies and other material to include or exclude in the Guidance. The agency's assessment of such material is deliberative.

72.     By casting a wide net using a wider date range, general terms and searching through the centralized IT system, the CDC avers that it has searched all

files likely to contain responsive materials. To the extent there has been a delay it is due to the fact that the CDC has experienced a large uptick in FOIA requests as a result of the COVID-19 pandemic, vaccines, masks, and other mitigation strategies. Because of this increase, it has taken longer to respond to FOIA requests. The January change in administrations also added to the delay in responses. Other requestors are waiting for their FOIA request responses, including those filed ahead of Plaintiff's. CDC-FOIA has received over 2,000 FOIA requests directly relating to COVID-19 in fiscal year 2021. Overall, around the time of Plaintiff's FOIA Request, there were 552 requests pending in CDC-FOIA. Ninety-four of those requests were under expedited treatment.

[Signature on following final page.]

Dated:        December 10, 2021


_Roger Andoh_
ROGER ANDOH